Argued and submitted May 23, 2008, reversed January 28, petition for review denied May 14, 2009 (346 Or 213)

Marlena OSBORNE,
fka Marlena Fadden,
and Dan Osborne,
*Petitioners-Respondents,*

*v.*

Gary FADDEN
and Susan Williams,
*Respondents-Appellants.*

Washington County Circuit Court
C052807CV; A131769 (Control), A137995

201 P3d 278

Philip F. Schuster, II, argued the cause for appellants. With him on the briefs was Dierking & Schuster.

Andy Simrin argued the cause for respondents. With him on the briefs was Andy Simrin, PC.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Rosenblum, Judge.

ARMSTRONG, J.

## ARMSTRONG, J.

Respondents[1] appeal a judgment entering two permanent stalking protective orders (SPOs), a money judgment, and an order certifying compliance with federal domestic violence firearm laws, 18 USC § 922(d)(8), (g)(8). On review, we conclude that the evidence is insufficient to support the entry of SPOs against either respondent, and, accordingly, we reverse.

■    We review the facts supporting an SPO *de novo*, giving deference to the trial court's express and implicit credibility determinations. *Jones v. Lindsey*, 193 Or App 674, 676, 91 P3d 781 (2004). Petitioner Marlena Osborne is married to petitioner Dan Osborne, and respondent Gary Fadden is married to respondent Susan Williams.[2] Marlena and Gary were previously married to each other and went through an acrimonious dissolution of their marriage, which forms the background for petitioners' civil stalking complaint. Marlena and Gary separated in spring 2003 and dissolved their marriage in spring 2005. They share custody of their 10-year-old daughter, R, and are in frequent contact with one another. Throughout the dissolution, the parties had parenting disputes that resulted in calls to the police, contempt proceedings against one another, and eventually, the present application for an SPO, filed in August 2005.

As the basis for an SPO, petitioners claim that, from June 2004 to November 2005, respondents sent more than 2,000 e-mails and e-mail solicitations to them, made harassing telephone calls to petitioners and petitioners' families

---

[1] On appeal, we refer to the parties as designated before the trial court. ORAP 5.15.

"In civil stalking proceedings, the party applying for relief is denominated the 'petitioner' and the party against whom the relief is sought is the 'respondent.' Obviously that nomenclature can be confusing in an appeal like this, where the 'respondent' below is the appellant and the 'petitioner' is the respondent."

*Hanzo v. deParrie*, 152 Or App 525, 527 n 1, 953 P2d 1130 (1998). All references in this opinion to respondents are to Gary Fadden and Susan Williams, and all references to petitioners are to Marlena Osborne and Dan Osborne.

[2] During the show cause hearing, respondent said that her name is Susan Fadden. Because she was identified as Susan Williams in the SPO petition, to avoid confusion we refer to her by that name in our opinion.

and friends, opened credit accounts in petitioners' names, signed petitioners up for subscriptions and mail order services, and engaged in a campaign to overwhelm and frustrate petitioners. The magnitude of that barrage was staggering to petitioners, and they claim that the volume and severity of the contacts increased after disputes with respondents and decreased after petitioners contacted Gary's attorney.

Some of the contacts contained content that was especially alarming to Marlena and Dan, because some concerned their children and others were sexual in nature. Susan also signed petitioners up for subscriptions for magazines and music services, resulting in at least 50 bills for unwanted services. Marlena testified that the subscriptions have hurt their credit rating, and that someone took out a loan for a car in their name. Susan also sent e-mails to Marlena posing as Marlena's best friend, e-mails to Marlena's former employer posing as the custody evaluator whom Gary and Marlena used in their dissolution proceeding, e-mails to Dan posing as Marlena, and e-mails to Dan's employer seeking to get Dan fired.

Dan reported the e-mails and calls to the Hillsboro Police Department. He had been able to open the header of some of the e-mails, and, as a result, had obtained the Internet Protocol (IP) address from which the e-mails had been sent. As described by Detective Shannon,

> "[a]n IP address is described as a string of four numbers separated by periods (such as 111.22.3.444) used to represent a computer on the Internet. When a [personal computer] accesses the Internet through an ISP [Internet Service Provider], it sometimes receives a temporary IP address. An IP address is a 32-bit number that identifies each sender or receiver of information that is sent across the Internet. An IP address has two parts: the identifier of a particular network on the Internet and an identifier of the particular device (which can be a server or a workstation) within that network. Every machine that is on the Internet has a unique IP address."

Detective Shannon obtained a court order to compel the Internet Service Provider for the IP address to disclose the location of the computer that used the address. He served the order on the provider, and he learned that the IP address

belonged to a computer at a pharmacy in Longview, Washington, at which Susan worked.

Detective Kazensky from the Longview Police Department went to the pharmacy and interviewed Susan. She told him, "I'm not going to lie, it was me doing it." Susan admitted that she entered Dan's and Marlena's information on websites offering mortgage loans once or twice, beginning in January 2005. Then she began receiving pop-up advertisements on the Internet, and she would click on them and go to advertisers' websites and sign up Dan and Marlena to receive e-mails, calls, and advertisements. Susan admitted doing that for many different kinds of advertisements, including pornography. She explained that she was frustrated with Gary and Marlena's relationship and wanted to get back at Marlena and Dan. She estimated sending solicitations to petitioners five to ten times per week and admitted e-mailing Dan's employer to try to get Dan fired. Susan told Kazensky that Gary was not aware that she had done those things. At that moment, Gary called Susan, and, based on the conversations between them that Kazensky overheard, it appeared to Kazensky that Gary did not know about Susan's actions.

In contrast, petitioners contend that Gary and Susan acted in concert because, in petitioners' view, the information that Susan used could only have come from Gary. For example, Marlena's social security number and wage information were used to open credit accounts and solicit services. Several contacts demonstrate an intimate knowledge of Marlena's life even though Marlena had never met Susan, such as e-mails posing as Marlena's best friend and e-mails posing as Gary and Marlena's custody evaluator. Similarly, petitioners noticed that the nature of the solicitations changed based on information that Dan and Marlena shared with R and that Gary presumably obtained from R during his parenting visits—when Dan and Marlena were shopping for a van, Susan solicited automobile loan offers; when they were looking for a home, Susan solicited mortgage offers; when Dan and Marlena told R they were considering remodeling their kitchen, they received solicitations from Home Depot and remodelers. Additionally, the frequency and volume of e-mails increased after disputes with Gary, and decreased after petitioners contacted Gary's attorneys.

Although none of the e-mails threatened harm to petitioners, petitioners claim that the contacts take on an alarming character when viewed in light of Gary's history of violence and anger. During their marriage, Gary physically intimidated and assaulted Marlena. The most severe incidents of abuse occurred several years ago. In one incident, Gary slammed Marlena's arm in a car door; in another, he broke Marlena's nose by head-butting her in the face. Gary also hit, kicked, and poked J, Marlena's 12-year-old daughter from a previous marriage. From her relationship with Gary, Marlena recognized a pattern of escalating behavior that, in light of the ongoing and troubling nature of the e-mail solicitations, made her fear for her personal safety.

Petitioners filed a complaint seeking SPOs against respondents in August 2005. After three days of testimony, the court found that Gary and Susan had conspired together to engage in conduct that met the requirements for entry of SPOs in favor of petitioners. The court entered permanent SPOs against respondents, awarded petitioners money damages and attorney fees, and entered an order certifying compliance with federal domestic violence firearm laws, 18 USC § 922(d)(8), (g)(8).

On appeal, respondents make 11 assignments of error, several of which we do not reach.[3] The remaining assignments challenge the court's finding that a civil stalking conspiracy existed between respondents and challenge the sufficiency of the evidence to support entering SPOs against respondents.

We turn first to petitioners' challenge to the court's finding that respondents engaged in a civil conspiracy to stalk petitioners. A civil conspiracy is " 'a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish some purpose not in itself unlawful by unlawful means.' " *Yanney v. Koehler*, 147 Or App 269, 273, 935 P2d 1235 (1997) (quoting *Bonds v.*

_____

[3] Because we reverse both SPOs based on insufficient evidence, we do not reach respondents' assignments of error challenging various evidentiary rulings, challenging the circuit court's procedural rulings about damages, and challenging the court's award of attorney fees.

*Landers*, 279 Or 169, 174, 566 P2d 513 (1977) (citations omitted)). It is not a separate tort or basis for recovery but, rather, a theory of mutual agency under which a conspirator becomes jointly liable for the tortious conduct of his or her coconspirators. *Granewich v. Harding*, 329 Or 47, 53, 985 P2d 788 (1999). To establish a civil conspiracy, petitioners must establish " '(1) Two or more persons * * *; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof.' " *Yanney*, 147 Or App at 273 (quoting *Bonds*, 279 Or at 174 (citation omitted)).

■    Respondents' principal challenge is to the sufficiency of proof on the third element, arguing that there is no evidence of an agreement between Gary and Susan to engage in the disputed conduct. Petitioners counter that the e-mails and solicitations use information about Dan and Marlena that Susan did not have, such as Marlena's social security number, wage information, information about Marlena's friends and family, and information about petitioners' children, and that that information was supplied by Gary. Additionally, petitioners claim that the frequency and severity of the contacts increased or decreased based on parenting disputes between Gary and Marlena, which demonstrate that Susan and Gary were working together. Taken together, petitioners argue, there is sufficient circumstantial evidence to prove the existence of a civil conspiracy between Gary and Susan to harass Marlena and Dan. On *de novo* review, we agree with petitioners and conclude that Gary and Susan acted in concert. We thus turn to the evidence supporting entry of SPOs against respondents.

■    A petitioner may obtain an SPO against another if the petitioner can establish three elements by a preponderance of the evidence. ORS 30.866(7). First, a petitioner must establish that two or more times, ORS 163.730(7), within the two years before the request for the SPO, ORS 30.866(6), the respondent intentionally, knowingly, or recklessly engaged in unwanted contact with the petitioner or a member of the petitioner's immediate family or household, thereby alarming or coercing the petitioner, ORS 30.866(1)(a). Second, when viewed in the totality of the circumstances, it

must be objectively reasonable for the petitioner to have been alarmed or coerced by the contacts. ORS 30.866(1)(b); *Pinkham v. Brubaker*, 178 Or App 360, 372, 37 P3d 186 (2001). Third, the contacts must cause the petitioner reasonable apprehension about the personal safety of the petitioner or a member of his or her immediate family or household. ORS 30.866(1)(c); *see also Delgado v. Souders*, 334 Or 122, 151-52, 46 P3d 729 (2002) (the term *personal safety* does not encompass apprehension of harm other than physical harm).

"Contact" is defined, in part, as

"(a)   Coming into the visual or physical presence of the other person;

"* * * * *

"(d)   Sending or making written or electronic communications in any form to the other person;

"(e)   Speaking with the other person by any means;

"(f)   Communicating with the other person through a third person;

"(g)   Committing a crime against the other person;

"(h)   Communicating with a third person who has some relationship to the other person with the intent of affecting the third person's relationship with the other person;

"(i)   Communicating with business entities with the intent of affecting some right or interest of the other person[.]"

ORS 163.730(3).

■      Additionally, for contacts that involve speech, Article I, section 8, of the Oregon Constitution requires proof that the contact constitutes a "threat." A threat (1) "instills in the addressee a fear of imminent and serious personal violence from the speaker," (2) "is unequivocal," and (3) "is objectively likely to be followed by unlawful acts." *State v. Rangel*, 328 Or 294, 303, 977 P2d 379 (1999). That definition "'exclud[es] the kind of hyperbole, rhetorical excesses, and impotent expressions of anger or frustration that in some contexts can be privileged even if they alarm the addressee.'"

*Id.* (quoting *State v. Moyle*, 299 Or 691, 705, 705 P2d 740 (1985)).

■ We turn first to the evidence that Susan stalked Marlena and Dan. Susan entered petitioners' personal information into Internet pop-up solicitations to cause advertisers to contact petitioners. She also created e-mail addresses that she used to impersonate Dan and Marlena, a friend of Marlena, and the custody evaluator used by Gary and Marlena in their dissolution proceeding. Many of the resulting e-mails and telephone solicitations that petitioners received were troubling.

Respondents argue that none of the expressive contacts meets the *Rangel* standard. Petitioners counter that some of the expressive contacts satisfy the *Rangel* standard and that others should be analyzed as nonexpressive contacts. *See, e.g., State v. Shields*, 184 Or App 505, 511, 56 P3d 937 (2002) (even though a telephone call is typically analyzed as an expressive contact, causing a telephone to ring without speaking is a nonexpressive contact). Here, we need not determine whether the contacts are expressive or nonexpressive because, even under the less-stringent standard for nonexpressive contacts, we do not find that the e-mails and telephone solicitations generated by Susan caused petitioners to have a reasonable apprehension about their *personal safety* or that of a member of their immediate family or household. ORS 30.866(1)(c).

Clearly, the volume and nature of e-mails and telephone calls generated by Susan was troubling and offensive to petitioners. However, we find that none of those contacts would cause petitioners to have a reasonable apprehension about their personal safety. Even the sexual solicitations received by Marlena would not do that, because there is no evidence that the calls were obscene or threatening—the callers merely indicated that they were responding to an invitation to contact her.

Petitioners also contend that Susan caused similar solicitations to be made to Marlena's first husband Craig, who is J's father, and to Dan's mother. We do not consider the contacts directed to Craig to be relevant, because he is not a member of petitioner's immediate family, as required by ORS

30.866(1)(c) and as defined by ORS 163.730(5). Additionally, we do not consider the contacts directed to Dan's mother to be applicable. Although she *is* a member of Dan's immediate family, there is no evidence linking the solicitations, telephone calls, and e-mails that she received to Susan or Gary.

■ We turn to the evidence that Gary stalked Marlena and Dan. All of Gary's contacts during the applicable period occurred in the context of parenting exchanges. Petitioners testified about several incidents of physical abuse by Gary, but those events are either undated in the record or outside of the two-year period specified in the SPO statute. Hence, we do not consider whether they meet the applicable standard, but we do consider them as part of the history of the parties' relationship that aids our determination of whether the contacts within the statutory period caused objectively reasonable alarm to petitioners.

Gary also made several threats to Marlena during their marriage and the dissolution of it. For example, Gary threatened that he would make Marlena pay if she retained a divorce lawyer, and similarly he threatened that, if Marlena ever left him, Gary would take R and Marlena would never see her again. However, those threats are undated, and, hence, we consider them only as context for the other contacts.

Petitioners also describe an incident that occurred while the temporary SPO was in effect, during Thanksgiving weekend 2005. Dan and Marlena went to Gary and Susan's house to pick up R, and, while they were waiting, they saw Gary go to his truck, remove a pistol wrapped in a towel, and take it into the house. Gary denies that he did that and claims that he removed other items from his truck. In any event, Gary has valid concealed weapons permits, and *even if* Gary did remove his pistol from the truck, neither party claims that Gary brandished or otherwise threatened petitioners with it. We need not resolve the factual dispute over the incident, because, even under petitioners' version of it, petitioners voluntarily placed themselves outside of respondents' home during a parenting exchange, and therefore we cannot say that the contact between them was unwanted.

Because respondents engaged in a civil conspiracy against petitioners, the evidence against each respondent is

imputed to the other. Consequently, the evidence against Susan is the same as the evidence against Gary, and both respondents are in the same legal position. Taken together and viewed in light of Gary's violent past and the context of the relationship between petitioners and respondents, petitioners failed to meet the requisite standard for the entry of SPOs against respondents, because nothing in the e-mails or telephone calls caused petitioners reasonable apprehension about the *personal safety* of either petitioner or a member of their immediate family or household, as required by ORS 30.866(1)(c). Accordingly, the evidence is insufficient to support the entry of an SPO against either respondent.

The court erred in entering permanent SPOs against respondents, and we reverse the entry of them. Accordingly, the money judgments and order certifying compliance with federal domestic violence firearm laws, 18 USC § 922(d)(8), (g)(8), must also be reversed.

Reversed.