Submitted December 4, 2009, reversed May 5, 2010

Shannon Arlene McGINNIS-AITKEN,
*Petitioner-Respondent,*

*v.*

Jerry Lee BRONSON,
*Respondent-Appellant.*

Douglas County Circuit Court
09CV0932ST; A141813

230 P3d 935

Steve C. Baldwin filed the brief for appellant.

No appearance for respondent.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

SCHUMAN, J.

**SCHUMAN, J.**

Petitioner McGinnis-Aitken obtained a stalking protective order (SPO) against respondent Bronson. Respondent appeals, arguing that the record does not contain facts or support inferences that meet the statutory requirements that can justify such an order. On *de novo* review, *Osborne v. Fadden*, 225 Or App 431, 433, 201 P3d 278, *rev den*, 346 Or 213 (2009); *Hanzo v. deParrie*, 152 Or App 525, 536-37, 953 P2d 1130 (1998), *rev den*, 328 Or 418 (1999), we agree.[1] Consequently, we reverse.

The legal standards governing the issuance of an SPO are well settled. We recently summarized them as follows:

"To obtain an SPO against a person under ORS 30.866(1), a petitioner must demonstrate by a preponderance of the evidence that

" '(a)   The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person or a member of that person's immediate family or household thereby alarming or coercing the other person;

" '(b)   It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

" '(c)   The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household.'

"ORS 30.866(1) has both subjective and objective components. To satisfy the subjective component, the petitioner must show that he or she was alarmed or coerced by the contacts, and that the contacts caused apprehension regarding his or her personal safety or the personal safety of a member of his or her immediate family or household. ORS 30.866(1)(a), (c); *Weatherly v. Wilkie*, 169 Or App 257, 259, 8 P3d 251 (2000). To satisfy the objective component,

---

[1] Our standard of review was recently amended. Or Laws 2009, ch 231, § 2. The amendments apply to appeals in which the notice of appeal was filed on or after June 4, 2009. Or Laws 2009, ch 231, § 3. Because the notice of appeal in this case was filed before then, we apply the 2007 standard of review.

'the contacted person's alarm or coercion must be objectively reasonable' and that person's apprehension for his or her personal safety must also be objectively reasonable. *Id.*; ORS 30.866(1)(b); *Pinkham v. Brubaker*, 178 Or App 360, 372, 37 P3d 186 (2001).

"ORS 30.866(1) also requires that the petitioner establish that the contacts that are the basis for the petition were repeated and unwanted. 'Repeated' contact means two or more contacts within the previous two years. ORS 30.866(6); ORS 163.730(7). The contacts may include, among other things, coming into the person's visual or physical presence; following the person; waiting outside the person's home, property, place of work, or school; speaking with the person; or sending or making written communications of any kind. ORS 163.730(3).

"If the contact involves speech, Article I, section 8, of the Oregon Constitution requires proof that the contact constitutes a threat. A threat 'is a communication that instills in the addressee a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts.' *State v. Rangel*, 328 Or 294, 303, 977 P2d 379 (1999). But a threat does not include 'the kind of hyperbole, rhetorical excesses, and impotent expressions of anger or frustration that in some contexts can be privileged even if they alarm the addressee.' *State v. Moyle*, 299 Or 691, 705, 705 P2d 740 (1985)."

*Swarringim v. Olson*, 234 Or App 309, 311-12, 227 P3d 818 (2010).

Petitioner and respondent had known each other for some time before the events that are relevant to this case took place. Respondent characterized himself as a person who "loved" petitioner but was not "in love" with her. He had expressed his feelings toward her by, among other things, building and presenting to her a custom desk. When she protested and offered to pay for the gift, he told her, "No, it's the only way I'm allowed to show you how much I love you, and in some sick way it's how I can have a relationship with you." Petitioner did not testify that, at the time, the contact was unwanted. However, she thereafter sent respondent a text message stating, "I'm sorry it took me so long to realize that you think you're in love with me but you deserve a healthy relationship, and being away from you is the kind of thing I

can do." When asked by the court whether she had ever told respondent that she did not want him to contact her, petitioner identified that last phrase—"being away from you is the kind of thing I can do"—as her attempt to convey the message.

Petitioner and respondent both testified that the following contacts subsequently occurred. Respondent left messages for petitioner at her workplace. According to petitioner, the messages were "like it's been a while, why don't you come over. I made spaghetti and meatballs and a pot of coffee." Also, respondent came to petitioner's home when petitioner's sister, but not petitioner, was present, and knocked on the door. Because he could hear a television in the background, he knocked loudly. Nobody answered, and he left. At another point, respondent went to petitioner's workplace, a gym, and left a book that he had borrowed from her outside the door to her office. Either she was not there at the time, or, if she was, she did not see him—the record is vague.

The incident that caused petitioner to seek an SPO occurred approximately two weeks before the hearing. Respondent sent petitioner the following letter:

> "It seems painfully clear that you wish to terminate our friendship, and if that's the case I will respect your desire to do so. I will not contact you again. As you know, emotion[al] pain is far worse than physical pain. Reflecting on that it would have been kinder if you would have kicked me in the balls. At first I wasn't angry. I put that behind me as it serves no useful purpose to dwell on it. I love you but I'm not in love with you. I really don't understand, so I'm asking you to explain it to me. What did I do to make you react in such a negative way towards me? Really, I don't have a clue. So at the very least put a note in one of my books and stick it in my mailbox, or if you're feeling courageous enough you can call me. Jerry.
>
> "PS: You know how it feels when people treat you badly. I didn't deserve this Shannon."

No further contact occurred.

Based on these incidents, the trial court ruled, "I'm going to go ahead and leave the [temporary] stalking order in place based on the evidence that I've heard here, that there

has been repeated contact that has alarmed [petitioner.]" We conclude that the court erred.

Respondent first argues that he did not have the requisite mental state under ORS 30.866; although petitioner might have made it clear that she wanted to end their relationship, she never told him that she wanted also to cease all contact. In response to the court's question, "Did you tell him not to contact you?" petitioner responded, "Yes. I said and staying away from each other is the kind of thing I could do." According to respondent, that message did not, and could not be expected to, put him on notice that there was a substantial risk that further contacts would be unwanted. We need not decide whether respondent's argument is correct, however, because, even if he knew or should have known that the contacts were unwanted, they do not qualify as contacts that support an SPO. Some of the contacts—the letter and the phone messages—are verbal communication, and therefore relevant for purposes of an SPO only if they "instill[ ] in the addressee a fear of imminent and serious personal violence from the speaker, [are] unequivocal, and [are] objectively likely to be followed by unlawful acts." *Rangel*, 328 Or at 303. Petitioner did not testify that she was in fear of serious, personal violence that she believed was likely to occur imminently, and, if she had so testified, her fear would not have been objectively reasonable. Although respondent's letter does imply that he is or has been angry ("At first I wasn't angry."), the letter contains no threats, it was not delivered in person, and it conveys no intimations of imminent violence (or any violence at all).

The nonverbal contacts, as well, cannot support an SPO. Leaving a borrowed book outside a person's office door would not cause a reasonable person to be alarmed or concerned for her personal safety or the personal safety of a member of her immediate family. Thus, even if the door-knocking incident could be counted, that would make only one incident, and an SPO requires at least two. In fact, there is no evidence in the record that petitioner was alarmed or concerned by the door knocking—or by anything else respondent did—so as to cause her alarm or concern for her safety or the safety of her family. In response to a question from the court regarding what it was about respondent's unwanted

contacts that made her apprehensive—a state of mind to which petitioner's sister testified on petitioner's behalf, but which petitioner herself theretofore had not claimed—petitioner answered, "It's the severity, the way it's progressed into anger, and that warning in your heart it's just like something's wrong here. Something is not right. Friends don't make each other feel this way."

We find that, at most, respondent engaged in one contact that could *possibly* be considered sufficiently alarming to count in the determination whether to issue an SPO. It takes two. We therefore reverse.

Reversed.