Argued and submitted May 31, 2018; reversed and remanded as to Toyota Motor Credit Corporation and Toyota Financial Services, otherwise affirmed January 23, 2020

Erik Loyal REED,
*Plaintiff-Appellant,*

*v.*

TOYOTA MOTOR CREDIT CORPORATION
and Toyota Financial Services, foreign corporations,
and Capitol Toyota, an Oregon corporation,
*Defendants-Respondents.*

Marion County Circuit Court
15CV19134; A164222

459 P3d 253

Plaintiff and defendant Toyota Financial Services (TFS) entered into an employment separation agreement that, among other things, allowed plaintiff to retain the TFS truck he had been using during his employment. TFS installed a global positioning system (GPS) tracking device onto the truck without plaintiff's knowledge or consent. When plaintiff discovered the GPS device on the truck, he filed this claim for invasion of privacy. The trial court granted summary judgment in favor of TFS and defendant Capitol Toyota (Capitol). Plaintiff appeals the grant of summary judgment as to both defendants. *Held*: The trial court erred as to TFS but did not err as to Capitol. Viewing the summary judgment record in the light most favorable to plaintiff, there was evidence from which a jury could find that TFS's covert installation of a GPS device on a vehicle for plaintiff's exclusive use was an intentional physical intrusion and that it was highly offensive, but, as to Capitol, plaintiff had not presented evidence of a civil conspiracy or the underlying tort of invasion of privacy that would create a genuine issue of material fact.

Reversed and remanded as to Toyota Motor Credit Corporation and Toyota Financial Services; otherwise affirmed.

Donald D. Abar, Judge.

George W. Kelly argued the cause and filed the briefs for appellant.

Paul W. Cane, Jr., argued the cause for respondents Toyota Motor Credit Corporation and Toyota Financial Services. Also on the brief were Paul Hastings LLP, Elizabeth A. Falcone, and Ogletree, Deakins, Nash, Smoak & Stewart, P.C.

Michael B. Merchant argued the cause for respondent Capitol Toyota. Also on the brief was Black Helterline LLP.

Before Ortega, Presiding Judge, and Powers, Judge, and Mooney, Judge.*

MOONEY, J.

Reversed and remanded as to Toyota Motor Credit Corporation and Toyota Financial Services; otherwise affirmed.

_____

\* Mooney, J., *vice* Garrett, J. pro tempore.

**MOONEY, J.**

Plaintiff and defendants Toyota Motor Credit Corporation/Toyota Financial Services (TFS)[1] entered into an employment separation agreement that, among other things, allowed plaintiff to retain the TFS truck he was already using. TFS installed a global positioning system (GPS) tracking device onto the truck without plaintiff's knowledge or consent. When plaintiff discovered the GPS device on the truck, he filed this claim for invasion of privacy. The trial court granted summary judgment in favor of TFS after concluding that, despite having installed the device, TFS did not actually access or monitor the data collected by it and, therefore, there was no invasion of privacy. The court granted summary judgment in favor of defendant Capitol Toyota (Capitol) because it concluded Capitol had nothing to do with the installation of the GPS device. We affirm as to Capitol and reverse and remand for further proceedings as to TFS.

Because this case is before us on the grant of summary judgment to defendants, we view the record in the light most favorable to plaintiff to determine whether there are any genuine issues of material fact and, if not, whether defendants are entitled to judgment as a matter of law. ORCP 47 C; *Brown v. Guard Publishing Co.*, 267 Or App 552, 562, 341 P3d 145 (2014). Under ORCP 47 C, no genuine issue as to a material fact exists if no objectively reasonable juror could return a verdict for the party opposing the motion—here, plaintiff—on the matter that is the subject of the motion.

We state the facts in accordance with that standard. TFS is part of the worldwide financial services operations for Toyota Motor Corporation, providing consumer loans for purchases of Toyota vehicles with branch offices throughout the United States. Plaintiff worked for TFS as an area sales manager in Lake Oswego, Oregon. His immediate supervisor was the office manager, Estes. The human resources (HR) department is in California.

---

[1] Toyota Motor Credit Corporation and Toyota Financial Services are one and the same entity. The company is best known by the acronym TFS, and we therefore refer to it as such.

In October 2012, a TFS employee reported that plaintiff was wearing a "large, dagger-style blade" at his belt line while at work. That same employee also provided HR with an online product review that plaintiff wrote about a similar "military-style serrated dagger" in which plaintiff commented that he tried wearing the belt but that it "did not wear well because of the length and the constant up and down of working in an office." The employee reported that he and other employees were concerned for their safety. Toyota has a policy that expressly prohibits employees from possessing weapons, including knives and daggers, on TFS property. Plaintiff disputes that he wore the dagger to work indicating instead that it was a "trainer" he wore to see how it felt while moving throughout the day.

Given the employee concerns as well as information from Estes that he "sensed increasing hostility" from plaintiff during performance reviews, TFS decided to place plaintiff on administrative leave in order to investigate the safety concerns. HR personnel were not able to immediately reach plaintiff to advise him of the decision and so they worked with the TFS IT team to locate plaintiff's company-owned iPad. They were able to watch the iPad on a map as it exited the freeway and travelled to a point outside Estes's house. According to Estes, there was no reason for plaintiff to be in front of his home. Later that morning, HR reached plaintiff and informed him of the investigation and that he was being placed on leave.

The subsequent investigation included nine interviews with plaintiff's coworkers. Those interviewed disclosed additional concerns about plaintiff, ranging from comments that he was "odd" and a "loner" to reports that he posted online about buying a bulletproof vest and that he watched videos of bullet making and shooting firearms on his work computer in front of his colleagues. Additionally, an employee emailed an HR manager that "I can't help but think this could become one of those classic cases when someone goes over the edge, and later everyone says things like . . . well he was kind of odd, he was a loner, he was a real gun nut, etc. So, I do want to go on the record by expressing my concerns in writing, should something ever happen in the future." (Ellipses in original.)

TFS terminated plaintiff's employment and decided to pursue a separation agreement with plaintiff to "reduce the risk that [plaintiff] would become violent or otherwise lash out at any of TFS's personnel." After several months of negotiations, the separation agreement was executed in March 2013.

As part of the separation agreement, TFS agreed to lease to plaintiff the Toyota Tundra that he had been using during his employment "for five years without cost to [plaintiff], after which the vehicle will be given to" plaintiff, subject to certain conditions. One of the relevant conditions required plaintiff to have the Tundra taken to Capitol for maintenance and a safety inspection. Despite that condition, plaintiff took the Tundra to a different Toyota dealership for an oil change and safety inspection. When he submitted a "repair order" from that service to demonstrate that the safety inspection had been completed, TFS informed him "that they would not honor the Settlement unless [plaintiff] took the truck to Capitol Toyota immediately." Plaintiff then took the truck to Capitol, where he was required to leave it for two days.

While the truck was at Capitol, Toyota's corporate security office, at the direction of TFS, installed a GPS device into the Tundra without plaintiff's permission or knowledge. The security office set up "geo-fences" across the public roadways leading to two locations that TFS considered to be at risk: TFS's Lake Oswego office and the Estes family home.[2] According to the manager of Toyota's corporate security office,

"the device was programmed to communicate only with Toyota's Corporate Security Office in Southern California. There, the geo-fence system was set up to trigger an alarm if and only if the Tundra crossed one of the geo-fence lines, which were placed to provide sufficient warning time to the Lake Oswego office and the Estes family in the event [plaintiff] drove to either location. *** If that happened, a member of the security team was to contact those locations,

_____

[2] According to Toyota, "'Geo-fences' are virtual gates. The locations of the gates can be programmed into a computer system using an online map, and an 'alarm' will sound if the devise passes through one of the gates."

and log-on to the system to begin monitoring [plaintiff's] location. [An additional geo-fence] was set-up \*\*\* that would sound the alarm if the Tundra was nearing in on the targets."

(Emphasis omitted.) After the device was installed and other work was completed on the Tundra, the truck was returned to plaintiff. He was not told about the installation of the GPS device or the geo-fences.

About one month later, plaintiff discovered the GPS device when he noticed wires hanging behind the gas and brake pedals of his truck. Eventually, plaintiff learned that the device had been installed by TFS, and he subsequently filed this case against TFS and Capitol for invasion of privacy.

Each defendant filed a motion for summary judgment, with Capitol primarily relying upon the points and authorities and supporting documentation submitted by TFS. TFS admitted that the GPS device was installed by its agents at its direction and no evidence was submitted by any party to show that Capitol had anything to do with the GPS device. TFS also produced evidence that the GPS device never triggered the alarm. "That could have been because [plaintiff] did not drive the Tundra to the exact spots on the public roadways that would have triggered the alarm. It [also] could have been because the geo-fence was not working properly." The trial court granted Capitol's motion because it concluded that there was no evidence "to show that they're involved in [the case] whatsoever." The trial court granted TFS's motion because it found that plaintiff "was never monitored. He was trespassed upon—his vehicle—but he was never monitored, so I don't know how there is a private place to be intruded upon."

Plaintiff appeals the general judgment of dismissal, assigning error to the trial court's decision to grant the summary judgment motions. We begin our review with the following historical and legal perspective on the nature of the claim presented.

Invasion of privacy is a tort; that is to say, a civil wrong. Oregon has long recognized a common-law cause of

action for invasion of privacy, on four different theories, all of which protect the right of a person "to be let alone." *Mauri v. Smith*, 324 Or 476, 482, 929 P2d 307 (1996). The right "to be let alone" is not a new legal concept. In 1888, Thomas Cooley wrote that "[t]he right to one's person may be said to be a right of complete immunity: to be let alone." Thomas M. Cooley, *A Treatise on the Law of Torts or the Wrongs Which Arise Independent of Contract* 29 (2d ed 1888).

Louis Brandeis and Samuel Warren referred to Cooley's "right to be let alone" when they explained that the tort of "invasion of privacy" derives from, and protects, the right to be let alone. Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 Harv L Rev 193, 195 (1890). They wrote in response to "[r]ecent inventions and business methods [that] call attention to the next step which must be taken for the protection of the person" and out of concern that "numerous mechanical devices threaten to make good the prediction that 'what is whispered in the closet shall be proclaimed from the house-tops.'" *Id*. They noted that the "law affords a principle which may be invoked to protect the privacy of the individual from invasion *** by the *** press, the photographer *or the possessor of any other modern device* for recording or reproducing scenes or sounds." *Id*. at 206 (emphasis added). GPS technology came long after Brandeis and Warren's groundbreaking article on privacy. But, the common law adapts to the times to meet the needs of society and one's use of GPS technology today must of necessity be circumscribed by the same right to be let alone that Brandeis and Warren wrote about well over 100 years ago.

This invasion of privacy case relies upon the "intrusion upon seclusion" theory. To prevail at trial, plaintiff must prove three elements: (1) an intentional intrusion, physical or otherwise, (2) upon the plaintiff's solitude or seclusion or private affairs or concerns, (3) which would be highly offensive to a reasonable person. *Mauri*, 324 Or at 482-83. In order to proceed to trial and present his case to a jury, plaintiff must respond to defendants' motions for summary judgment by producing sufficient evidence to show that triable issues remain on those elements challenged by defendants.

We begin with the motion of TFS. It disputes plaintiff's allegation that it intruded upon his privacy by entering into the truck for the purpose of secretly installing the tracking device and by monitoring plaintiff's location with the GPS device.[3] First, TFS argues that entry into the truck to install the GPS device was not an intrusion because the truck belonged to TFS and that plaintiff "merely had the right to free use of it under the Separation Agreement." Second, TFS contends that the GPS system did not intrude on plaintiff's privacy because it was a "passive system" that was not monitored and did not alarm. Third, TFS contends that it did not intrude on a "private place" or "area of seclusion." And, fourth, TFS contends that its actions would not be highly offensive to a reasonable person—a necessary element for the tort.

The first argument presupposes that ownership of the truck provides a defense. TFS assumes it owns the truck to the exclusion of any rights in plaintiff. The parties' rights, however, are determined by the terms of the lease and separation agreement. Basic property law concepts remind us of the idiom, bundle-of-sticks; that "collection of individual rights which, in certain combinations, constitute property." *United States v. Craft*, 535 US 274, 278, 122 S Ct 1414, 152 L Ed 2d 437 (2002).

> "Property is more than just the physical thing—the land, the bricks, the mortar—it is also the sum of all the rights and powers incident to ownership of the physical thing. It is the tangible and the intangible. Property is composed of constituent elements and of these elements *the right to use the physical thing to the exclusion of others is the most essential and beneficial*. Without this right all other elements would be of little value."

*Dickman v. C. I. R.*, 465 US 330, 336, 104 S Ct 1086, 79 L Ed 2d 343 (1984) (internal quotation marks omitted; emphasis added); *see also Kaiser Aetna v. United States*, 444 US 164, 176, 100 S Ct 383, 62 L Ed 2d 332 (1979) ("[O]ne of the most essential sticks in the bundle of rights * * * [is] the right to exclude others.").

---

[3] Neither party disputes that TFS acted intentionally; therefore, we do not further discuss that element of the tort.

ORS 72A.1030(1)(j) defines a "lease" as "a transfer of the right to possession and use of goods for a term in return for consideration" and, therefore, it divides "the bundle" of individual property rights to the leased property differently than a full conveyance would. Neither the lessor nor lessee holds the entire bundle. As explained in *Dickman*, the right to use the leased property includes the "right to use *** to the exclusion of others." 465 US at 336. Through the lease, TFS transferred to plaintiff the right to use and to exclude others (including TFS except as agreed in the separation agreement) from the truck. Given the right to exclude others and evidence that plaintiff did not consent to the installation of the GPS device, we conclude that the trial court erred in granting summary judgment for TFS insofar as a genuine issue exists on the question of whether TFS intruded into plaintiff's privacy by installing the GPS device.

We are likewise unpersuaded by TFS's second argument that there is no evidence that it *intruded* on plaintiff's privacy "[b]ecause the alarm never sounded, TFS's Corporate Security never was prompted to, and never did, monitor the Tundra's location." TFS cites several out-of-state cases for the proposition that there is no intrusion "in the installation of a listening device that never is used." Those cases have no mandatory precedential effect in this court, and they are not persuasive here. They are distinguishable in this important way: There *was* actual monitoring in the case before us. Although the evidence is that nobody accessed the location data, the record shows that data was collected on a continuous basis.[4]

Oregon courts follow the *Restatement (Second) of Torts* approach to evaluating the tort of invasion of privacy. *Mauri*, 324 Or at 482. Commentary to the *Restatement (Second) of Torts* provides that an invasion or intrusion may occur with "the use of the defendant's senses, with or

---

[4] TFS also raises *Marks v. Bell Telephone Co.*, 460 Pa 73, 331 A2d 424 (1975), to argue that a claim for invasion of privacy cannot be established "even when a plaintiff's conversations were recorded, [because] there was no intrusion if no one ever listened to the recordings." We reject that argument. That case involved the Pennsylvania Anti-Wire Tap Act, not the common-law tort of invasion of privacy. To the extent that the court addressed the common-law tort of invasion of privacy, it did so while addressing the appellant's argument on damages, not the merits of the claim.

without mechanical aids, to oversee or overhear the plaintiff's private affairs." *Restatement (Second) of Torts* § 652B comment b (1974); *see also Hernandez v. Hillsides, Inc.*, 48 Cal Rptr 3d 780, 787 (2006), *rev'd on other grounds*, 47 Cal 4th 272, 211 P3d 1063 (2009) ("Intrusion involves a plaintiff's peace of mind and right to be left alone. The focus is on whether the defendants penetrated 'some zone of physical or sensory privacy surrounding, *or obtained unwanted access to data about*, the plaintiff,' not whether the data was ever obtained or disclosed." (Emphasis added.)). We conclude that a genuine issue of fact exists on the question whether TFS intruded into plaintiff's seclusion by entering the truck and installing the GPS device and by its ongoing collection of location data.

TFS's third argument is that it is not liable, even if it intruded, because no "private place" or area of "seclusion" is involved in this case given that plaintiff was driving on a public road and had no reasonable expectation of privacy. To support its argument, TFS again relies on cases that are not binding on this court. And, importantly, the Oregon Supreme Court rejected that same argument in *State v. Campbell*, 306 Or 157, 159, 759 P2d 1040 (1988), where it was called upon to decide "whether police use of a radio transmitter to locate a private automobile to which the transmitter has been surreptitiously attached is a 'search' or 'seizure' under Article I, section 9, of the Oregon Constitution." While *Campbell* was decided in a different context, it is instructive here.

In *Campbell*, the state argued that attaching the device was neither a search nor a seizure for two reasons: First, no privacy interest was infringed "because the transmitter disclosed only what any member of the public could legitimately have observed" and, second, even if the transmitter "enhanced" the police's observations, "defendant had no privacy interest outside 'protected premises.'" *Id*. at 165. In the state's view, "the police [would] engage in a search only if they monitor a transmitter while it is within 'protected premises' such as a home." *Id.*

As to the first argument, the court rejected the state's theory—that "information legitimately available through one means may be obtained through any other means"—on

legal grounds by stating that "[t]he issue is not whether what the police learned by using the transmitter * * * was 'exposed to public view,' but whether using the transmitter is an action that can be characterized as a search." *Id.* at 166-67. Therefore, the court concluded that the "use of a radio transmitter to locate an object to which the transmitter is attached *cannot be equated with visual tracking.*" *Id.* at 171-72 (emphasis added). The court also rejected the state's second argument—that only government actions "that observe conduct or objects within 'protected premises' are searches, [because] * * * it is only within 'protected premises' that an individual has a privacy interest protected by Article I, section 9." *Id.* at 167. The court explained that

> "the rules laid down for the government by Article I, section 9, must be rules that the government is capable of following. Using a transmitter is either a search or it is not. Whether using the transmitter is a search cannot depend upon the fortuity of where the transmitter happens to be taken by the person under observation. In order to decide whether the government has searched, we must look to the nature of the act asserted to be searched."

*Id.* at 170. The court concluded that the act of attaching the transmitter was a search, in part, because,

> "[w]ith respect to the use of radio transmitters to locate objects and people, it is not even possible to ascertain whether the use is directed at a 'protected premise' until after the object or person is located. Learning the location of the object or person is, after all, the purpose of the device."

*Id.* at 169-70.

Although the court announced those principles in a different legal context, they logically apply to this invasion of privacy case. We look to these principles not only because of their rational clarity, but also because "[g]overnment scrutiny aside, individual freedom from scrutiny is determined by *social and legal norms of behavior*, such as trespass laws and conventions against eavesdropping"—that is, the two analyses inform each other. *Id.* at 170 (emphasis added); *see also Minnesota v. Carter*, 525 US 83, 88, 119 S Ct 469, 142 L Ed 2d 373 (1998) ("[I]n order to claim the protection

of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; *i.e.*, *one that has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'*" (Emphasis added.)); *State v. Lien/Wilverding*, 364 Or 750, 759-60, 441 P3d 185 (2019) (although Article I, section 9, rights are "not defined by private property or contractual rights," they "may inform the analysis in a given case"); *Hernandez v. Hillsides, Inc.*, 47 Cal 4th 272, 286, 211 P3d 1063, 1072 (2009) ("As to the first element of the common law tort, the defendant must have 'penetrated some zone of physical or sensory privacy \*\*\* or obtained unwanted access to data' by electronic or other covert means, in violation of the law or social norms.").[5] Just because the data recorded by the GPS device was not used does not mean that the secret installation of the device onto plaintiff's leased vehicle was not an invasion of his privacy. An issue of material fact remains for a jury to decide whether, under the circumstances of this case, the installation of the GPS device amounted to an intrusion into a private place.

Finally, TFS disputes that its actions would be highly offensive to a reasonable person, a critical element of the tort. "In determining whether the defendant's conduct was tortious, the fact that it constituted an unlawful trespass is only one factor to be considered." *Magenis v. Fisher Broadcasting, Inc.*, 103 Or App 555, 562, 798 P2d 1106 (1990). A jury may find other factors relevant to whether the defendant's conduct was "highly offensive," such as "the extent of the intrusion, the context, conduct and circumstances surrounding the intrusion, the defendant's motives, the setting into which defendant intruded and the plaintiff's expectation of privacy." *Id.*

TFS argues that the context and circumstances of this case include the complaints and concerns of plaintiff's coworkers, plaintiff's location outside of Estes's house, and the then-recent shootings at the Clackamas Town Center

---

[5] We acknowledge that *Hernandez* explicitly "sidestepped cases" involving government searches. 47 Cal 4th at 294 n 9, 211 P3d at 1078.

and Sandy Hook Elementary School. TFS argues that its "only motive was to protect its workforce" and that it took a "narrowly tailored approach" to carry out that "obligation." TFS cites *Hernandez*, 47 Cal 4th at 295, 211 P3d at 1078, to argue that, as a matter of law, its actions could not be highly offensive to a reasonable person. But, unlike *Hernandez*, the device in this case was installed after the employment relationship ended. The case before us is not about the reasonableness of an employer's HR process designed to protect its workforce from internal safety threats. This case is about the steps TFS took after it identified safety concerns involving plaintiff and terminated him from employment. Had TFS reported its ongoing safety concerns to the police at that point, a warrant would have been necessary before officers could place any sort of tracking device on plaintiff's truck. A jury might reasonably conclude that TFS's covert placement of the GPS device was highly offensive.

Viewing the summary judgment record in the light most favorable to the nonmoving party, there is evidence from which a jury could find that the covert installation of a GPS device on a vehicle intended for plaintiff's exclusive use is an intentional physical intrusion and that it was highly offensive. The trial court erred in granting summary judgment in favor of TFS.

We now address Capitol's motion for summary judgment. Plaintiff seeks to hold Capitol liable on a theory of civil conspiracy.

> "A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish some purpose not in itself unlawful by unlawful means. It is not a separate tort or basis for recovery but, rather, a theory of mutual agency under which a conspirator becomes jointly liable for the tortious conduct of his or her coconspirators. To establish a civil conspiracy, petitioners must establish (1) Two or more persons ***; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof."

*Osborne v. Fadden*, 225 Or App 431, 436-37, 201 P3d 278, *rev den*, 346 Or 213 (2009) (internal citations and quotation

marks omitted). Plaintiff has not presented evidence to support such a theory of liability. While the GPS was installed on the truck at Capitol's service center, the record contains no evidence that Capitol knew about or participated in its installation. TFS admitted that it procured and installed the GPS device and denied that Capitol had any involvement with that. No evidence was presented to support a meeting of the minds to establish a civil conspiracy or the underlying tort of invasion of privacy. We conclude that the evidence viewed in the light most favorable to plaintiff reveals no genuine issue of material fact. Capitol was entitled to judgment as a matter of law.

For the foregoing reasons, the trial court erred in granting summary judgment to TFS but did not err in granting summary judgment to Capitol.

Reversed and remanded as to Toyota Motor Credit Corporation and Toyota Financial Services; otherwise affirmed.