Argued and submitted October 19, 2020, affirmed December 22, 2021

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DENZEL CORTEZ HAWTHORNE,
*Defendant-Appellant.*

Marion County Circuit Court
17CR69313; A168045

504 P3d 1185

Defendant appeals a judgment of conviction for murder, first-degree robbery, and unlawful use of a weapon. He first assigns error to the trial court's denial of his motion to suppress evidence resulting from a warrantless "ping" of his cell phone's location, arguing that the trial court erroneously concluded that the warrantless ping was justified by exigent circumstances. The state cross-assigns error, arguing that the trial court erred initially in concluding that defendant had a protected privacy interest in the cell-site location information generated by his service provider. The state therefore contends that the ping was not a search in the constitutional sense. Defendant also challenges the proportionality of his sentence, arguing that the trial court failed to address the constitutional implications of his intellectual disability under *State v. Ryan*, 361 Or 602, 396 P3d 867 (2017). *Held*: Eliciting defendant's phone's real-time location was a search under Article I, section 9, of the Oregon Constitution, but exigent circumstances permitted detectives to ask the cell service provider to reveal that information without first obtaining a warrant. Consequently, the trial court did not err in denying defendant's motion to suppress. The trial court also did not err in imposing defendant's sentence, as the record shows that the court adequately considered evidence of his intellectual disability and its effect on the proportionality of his sentence under Article I, section 16, of the Oregon Constitution.

Affirmed.

Thomas M. Hart, Judge.

David O. Ferry, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

David B. Thompson, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before DeVore, Presiding Judge, and DeHoog, Judge, and Mooney, Judge.

DeVORE, P. J.

Affirmed.

**DeVORE, P. J.**

Defendant appeals a judgment of conviction for murder, first-degree robbery, and unlawful use of a weapon. ORS 163.115; ORS 164.415; ORS 166.220 (2015). The police identified defendant as a suspect within a couple hours of the murder at issue. Before they obtained a search warrant, detectives asked that defendant's cell phone service provider "ping" defendant's phone's location to help locate the fleeing suspect. On appeal, defendant first assigns error to the trial court's denial of his motion to suppress evidence resulting from that ping. He argues that the trial court erroneously concluded that the warrantless ping was justified by exigent circumstances. The state cross-assigns error, arguing that the trial court erred initially in concluding that defendant had a protected privacy interest in the cell-site location information generated by his service provider. The state argues that, because defendant lacked a privacy interest, the ping was not a search under either Article I, section 9, of the Oregon Constitution or the Fourth Amendment to the United States Constitution.

Defendant also challenges the proportionality of his sentence, arguing that the trial court failed to address the constitutional implications of defendant's intellectual disability under *State v. Ryan*, 361 Or 602, 396 P3d 867 (2017).[1]

We conclude that eliciting the phone's location was a search under Article I, section 9, but that, under the circumstances of this case, the warrantless search was justified by exigent circumstances. We also conclude that the trial court did not err in imposing defendant's sentence, because the record shows that the court considered evidence of defendant's intellectual disability and its effect on the proportionality of his sentence. Accordingly, we affirm.

## I.  FACTS

The parties do not dispute the following facts. Defendant is from Detroit, Michigan, and was attending college in North Dakota. In May 2016, while defendant was visiting Oregon, he began buying marijuana from W.

---

[1] Defendant was sentenced to life imprisonment with a minimum of 300 months to be served for Count 1 (murder).

During that visit, defendant purchased a pound of mari-
juana and stayed the night at W's parents' home, where
W lived with his girlfriend, J. Defendant and W agreed
that defendant would return to school and mail money to
W, and W would then mail additional marijuana to defen-
dant. Defendant and W's relationship deteriorated when W
mailed less marijuana than promised on multiple occasions.

Defendant began sending threatening social media
messages to J.[2] On May 22, 2016, defendant messaged J that
"if I gotta come down there it's going to get ugly." Defendant's
messages to J, who was pregnant, escalated. He messaged
J that she would "suffer the same consequences" as W and
that, if she kept "talking[,] when I come down there * * *,
we're going to run a train on you" but that, "if your baby
daddy sending my shit like he suppose to, then you have
no worries." On June 13, 2016, defendant warned J, "If I
was you, I wouldn't be around [W] for a while because I just
* * * got off the phone with my uncle and he's going to get
a little visit soon. If you was smart, you would keep your
distance."

On June 28, 2016, W bought J a new car, and J
posted a picture of the car on social media. Within a few
days, two of the car's tires were slashed while the car sat in
their driveway overnight. Defendant took credit for having
the tires slashed. On July 28, 2016, defendant messaged J,
stating:

> "Can I come to the house and pick [the marijuana] up or
> will you all send it, but it's no way I'm not about to let that
> shit slide. All that shit talking just feeding me energy to do
> what I got to do which would leave one of you all a single
> parent. * * * If I don't hear from him tonight, I'll get the * * *
> point and from then on it's bomb away. It's a dirty game
> that I really think is a joke. You only get one life."

Defendant followed up:

> "[W] gonna be the death of you all. I have given him a
> chance to make it right but he seem to take me for a joke.
> So let's see what happens next. Fuck them petty-ass tires.

---

[2] Because defendant's messages are central to our analysis of whether exi-
gent circumstances existed in this case, we quote them in some detail.

Baby [E] might not never know her dad. And if he hides, then take a guess who will be next in line.”

When J told defendant to leave her alone, he responded:

“[W] couldn’t even answer my phone so I’m back on top and when shit start getting real, don’t beg, don’t apologize, don’t cry, just prepare. All you all got to do is give me my shit and this can all be over.

“* * * * *

“I really hope you all don’t bring that baby to the house because when I cocktail bomb that bitch, the first person running out is getting shot.

“* * * * *

“That mean I’m ready to do life for this shit. You all taking money out of my family’s mouth so that means fuck to family. I hope your fucking baby dies in your stomach from stress since you all don’t want to send my shit.”

Defendant and his friend, Carrera, drove from North Dakota, and, shortly before 8 p.m. on August 1, showed up at W’s parents’ home. W’s mother, L, and father, B, were home watching a movie with two friends, but neither W nor J was home. Defendant and Carrera walked into the home without knocking. Defendant held a pistol and Carrera held a shotgun. When defendant learned that W was not home, he became angry and demanded either payment or the marijuana he was owed. He put his pistol to B’s head and had B lead him to the garage in search of marijuana. When they returned from the garage, defendant was carrying a bag with marijuana in it, and defendant and Carrera placed valuables into a bedsheet.

At that point, W returned home and opened the door. L shouted to W to run. Carrera ran after W, returned about a minute later, and told defendant that he “took care of it.” Although Carrera had not actually caught up with W, W’s parents understood Carrera’s report to mean that he had killed W. B approached defendant, grabbed the bedsheet, and shoved defendant down a hallway. B broke a piece off of the handle of Carrera’s shotgun and moved to tackle

defendant. Defendant shot B in the head, then ran with Carrera out of the house.

B was transported to the hospital, where he later died. Deputies arrived at the scene at 7:56 p.m. and began interviewing witnesses and preparing a search warrant. Neighbors reported seeing the two suspects fleeing with their weapons in a red Pontiac. The detectives located W and J and began interviewing them shortly after 10 p.m. The detectives learned that W and J had a history with defendant. W provided defendant's phone number. W also showed detectives texts between defendant and W from 8:35 p.m., after the shooting. In a heated exchange of messages, the men arranged to meet at another address for an apparent confrontation. In an hour-long interview, J provided detectives with her phone and the history of messages between defendant and J.

After receiving defendant's phone number and reviewing defendant's threatening messages to W and J, detectives contacted defendant's service provider, AT&T, at 11:14 p.m. Pursuant to the Stored Communications Act (SCA), 18 USC § 2702(c)(4), detectives asked AT&T to ping defendant's phone to provide its general location.[3] AT&T complied. The location was close to the Budget Inn Motel in Woodburn. Detectives spotted a red Pontiac in the motel's parking lot with Illinois plates registered to Carrera. They confirmed with motel management that defendant had checked in. A search warrant for the motel room was approved at 5:15 a.m., and defendant was taken into custody at 5:50 a.m.

## II.   PROCEEDINGS

Prior to trial, defendant moved to suppress the cell-site location information (CSLI) from AT&T and any derivative evidence. Defendant argued that, under Article I, section 9, of the Oregon Constitution and the Fourth Amendment

---

[3] Pursuant to 18 USC § 2702(c), cell phone service providers

"may divulge a record or other information pertaining to a subscriber *** to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency[.]"

to the United States Constitution, defendant retained a privacy interest in his real-time CSLI. Defendant argued that, because he retained a privacy interest, asking AT&T to ping his phone's location constituted a search requiring a warrant. Defendant argued that no exception to the warrant requirement was available under the circumstances because any exigency from the 8:00 p.m. shooting or later text messages had dissipated by the time AT&T pinged his phone at 11:14 p.m.

The trial court concluded that defendant retained a privacy right as to his real-time location as indicated by his CSLI, but that exigent circumstances justified the warrantless ping of defendant's phone because the location information was necessary to prevent physical harm to the persons targeted by defendant's various threats.[4]

In a jury trial, defendant was convicted of felony murder, ORS 163.115 (a lesser-included offense), two counts of first-degree robbery, ORS 164.415, and five counts of the unlawful use of a weapon with a firearm, ORS 162.220.[5] Defendant was sentenced to the mandatory minimum sentence of life with the possibility of parole after 25 years for his felony murder conviction, and five consecutive years for his first-degree robbery and unlawful use of a weapon convictions.

On appeal, defendant renews his arguments from his motion to suppress, in which he contends that the circumstances were insufficiently exigent to justify the warrantless ping of his phone's location. He argues that any exigency had dissipated by the time detectives requested the ping, three hours after the shooting. By that time, defendant argues that detectives had found pieces of the gun at the scene, signaling that the suspects' guns were "likely inoperable." Defendant argues that there was no remaining

---

[4] The trial court did not specify whether it concluded that defendant held a privacy interest in his real-time location information under Article I, section 9, the Fourth Amendment, or both.

[5] Count 1 had charged aggravated murder. ORS 163.095 (2015). The trial court merged the jury's guilty verdicts on an alternative theory of the lesser-included felony murder, ORS 163.115, another count of first-degree robbery, ORS 164.415, and two counts of first-degree burglary, ORS 164.225.

threat of physical injury or harm to anyone that required a warrantless search, because B and L were at the hospital and W and J were at the sheriff's office being interviewed. Thus, defendant concludes that the ping violated his right to be free from unreasonable searches and seizures under both Article I, section 9, and the Fourth Amendment.

The state responds, first, by cross-assigning error to the trial court's initial conclusion that defendant had a privacy interest in his real-time CSLI. The state argues, as it did in the trial court, that, because defendant voluntarily entered into a contract with AT&T—which, the state contends, collects location data as part of its general business practices—defendant did not retain an interest in information he relinquished to a third party. If defendant did retain a privacy right in his real-time location information, the state argues that the trial court correctly concluded that there was an exigency justifying a warrantless ping of defendant's phone.

In his second assignment of error, defendant challenges the proportionality of his sentence under Article I, section 16, of the Oregon Constitution. Defendant argues that the trial court erred in its consideration of evidence that defendant is "mildly intellectually disabled" under *Ryan*, 361 Or 602, because "the punishment that was imposed * * * is the same as would be imposed for the far more culpable actions of a normally-abled defendant." The state responds that the trial court did not err under *Ryan* because the trial court considered the constitutional effects of defendant's intellectual disability and that disability's impact on the proportionality of defendant's sentence on the record, which is all that *Ryan* requires.

We first conclude that the trial court did not err in determining that defendant, as a cell phone user, retained a privacy interest in his real-time CSLI under Article I, section 9. Under the circumstances of this case, however, we conclude that the exigency presented by the totality of information known to detectives justified a warrantless ping to determine that information. We also conclude that the trial court did not err in its consideration of defendant's intellectual disability during sentencing.

### III.   MOTION TO SUPPRESS

A.   *Privacy Interest*

We first consider whether defendant retained a privacy interest in the real-time location of his cell phone under Article I, section 9. *See State v. Campbell*, 306 Or 157, 162, 759 P2d 1040 (1988) (explaining that before we decide a federal claim, we first consider and decide all questions of state law). Whether a constitutionally protected privacy interest exists is a question of law. *State v. Sparks*, 267 Or App 181, 189, 340 P3d 688 (2014), *rev den*, 357 Or 325 (2015).

Article I, section 9, provides, in part, that "[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]" The "threshold test" in analyzing an Article I, section 9, challenge is determining whether the government conduct at issue is sufficiently intrusive so as to constitute a search. *State v. Wacker*, 317 Or 419, 426, 856 P2d 1029 (1993). A "search" under Article I, section 9, occurs when the government invades a protected privacy interest. *State v. Meredith*, 337 Or 299, 303, 96 P3d 342 (2004).

The Oregon Supreme Court has explained that, in deciding whether a government action is a search,

> "we must decide whether the practice, if engaged in wholly at the discretion of the government, will significantly impair 'the people's' freedom from scrutiny, for the protection of that freedom is the principle that underlies the prohibition on 'unreasonable searches' set forth in Article I, section 9."

*Campbell*, 306 Or at 171.

The Supreme Court has also cautioned that,

> "if Article I, section 9, is to have any meaning[,] it must be read in light of the ever-expanding capacity of individuals and the government to gather information by technological means. It must, in other words, speak to every possible form of invasion—physical, electronic, technological, and the like."

*State v. Smith*, 327 Or 366, 373, 963 P2d 642 (1998).

The question here is whether the state's request to ping a cell phone to reveal its real-time location is sufficiently intrusive so as to be considered a search. The question requires an explanation of the nature of a ping. Here, Detective Emmons testified that a ping is a "request [from the police] to a cellular service provider to give [the police] the location of a cellular device." A ping does not reveal the precise address or location of a phone, but the location is generally accurate, and, according to Emmons, can give a location within a meter of the phone's location.

Elsewhere, the United States Supreme Court discussed the nature of cell phone tracking in *Carpenter v. United States*, 585 US ___, 138 S Ct 2206, 2211, 201 L Ed 2d 507 (2018), noting that the accuracy of the location information increases with the concentration of cell sites, or towers, within the area, because a cell phone continuously taps into those cell sites as it searches for a signal. As technology improves and cell sites increase, cell phones generate "increasingly vast amounts of increasingly precise CSLI." *Id.* at 2212.[6]

Neither the Oregon Supreme Court nor the United States Supreme Court has addressed the privacy-right implications of real-time CSLI. Yet, we can take guidance from a similar decision of the Oregon Supreme Court in one case, while we distinguish another case. In those cases, the court analyzes the privacy interest retained in a person's physical location as generated by a radio transmitter, a technology that also easily reveals a person's location.

In *Campbell*, the court recognized that, under Article I, section 9, a person has a privacy interest in keeping his car's location free from surveillance by means of a radio transmitter. *Campbell*, 306 Or at 172. Where officers attached a radio transmitter to the defendant's car while it was parked in a public parking lot, the court reasoned that "[a]ny device that enables the police quickly to locate a person or object anywhere within a 40-mile radius, day or night, over a period of several days, is a significant limitation on

---

[6] When analyzing the existence of a privacy interest under Article I, section 9, we look to cases interpreting the Fourth Amendment only for their acknowledgement of the nature of cell phone tracking.

freedom from scrutiny[.]" *Id*. That intrusion is "made more substantial" because covertly installing a radio transmitter leads to monitoring that is "much more difficult to detect than would-be observers who must rely upon the sense of sight." *Id*. The use of radio transmitters by officers meant that no one could be sure that their location was not being monitored absent a meticulous and ongoing examination of their possessions. *Id*.

The intrusion caused by pinging a cell phone is even greater than that posed by a tracking device attached to a car. Today, a cell phone is necessary for participation in modern life, and it is "almost a feature of human anatomy" that "tracks nearly exactly the movements of its owner." *Carpenter*, 585 US at ___, 138 S Ct at 2218 (internal quotation marks omitted). When the "[g]overnment tracks the location of a cell phone[,] it achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user." *Id*. The power to track location has the potential to reveal where a person spends time—information that could reflect a person's religious, political, social, or professional associations. As ubiquitous as cell phones are, they could become tracking devices that the authorities could tap into at will. That potential would "significantly impair the people's freedom from scrutiny." *Campbell*, 306 Or at 171 (internal quotation marks omitted). Without a warrant to assure judicial oversight, such clandestine, technological intervention would be susceptible to abuse. Mindful of *Campbell*, we conclude that pinging defendant's phone to reveal its real-time location was a sufficiently intrusive action to be a search under Article I, section 9.[7]

---

[7] We recently addressed the intrusive nature of GPS tracking technology, *albeit* in the context of the civil tort of "invasion of privacy," acknowledging that even as far back as the late 1800s, the concern about how "[r]ecent inventions and business methods" threaten an individual's privacy is as concerning today as when Samuel D. Warren and Louis D. Brandeis first wrote on the topic in their groundbreaking article, The Right to Privacy, 4 Harv L Rev 193, 195 (1890). *Reed v. Toyota Motor Credit Corp.*, 301 Or App 825, 831, 459 P3d 253 (2020). We reasoned that "the common law adapts to the times to meet the needs of society and one's use of GPS technology today must of necessity be circumscribed by the same right to be let alone that Brandeis and Warren wrote about well over 100 years ago." *Id*. That same logic applies here as we apply the common law principles of Article I, section 9, search jurisprudence to modern cell phone technology.

That conclusion, contrary to the state's argument, is not foreclosed by the Oregon Supreme Court's decision in *Meredith*. In *Meredith*, the court clarified that, although a person has a privacy interest in his or her location being free from tracking by a radio transmitter, that interest must be assessed in light of the "particular context in which the government conduct occurred." 337 Or at 306. Where the government installed a transmitter on the defendant's work-provided truck to monitor the defendant's location while on duty at work, the court found that the defendant did not retain a privacy interest "with respect to that truck's location," particularly where the "transmitter never disclosed anything other than that location." *Id.* at 307.

The state argues that, by entering into a contract with his cell service provider, defendant entered into a "unique relationship," like the relationship of the defendant in *Meredith* with her employer, where she did not have a protected privacy interest in her phone's location. The state argues that defendant lacked a protected privacy interest because, by entering into a contract with AT&T for cell phone service, he gave AT&T the ability to ping his phone at any time to determine its location for "any legitimate business purpose."

The state misreads *Meredith*. *Meredith* examined that privacy interest "in light of the particular context in which the government conduct occurred." Those circumstances—where there is no privacy from the employer concerning the employer's truck during work hours—are not comparable. Defendant's service agreement with a cell service provider is not equivalent to the employment relationship in *Meredith*. It is not an agreement to have the government use his or her phone as a real-time tracking device. A cell-phone service agreement is not an exception to a person's privacy interest in their real-time CSLI.

The state argues that a person has no privacy interest in information that he or she contractually permitted a third party to generate for legitimate business purposes. That argument parallels the reasoning of the third-party doctrine, upon which the state also relies. Under Article I, section 9, Oregon courts have held that, in some instances,

a person does not have a protected privacy interest in information that the person voluntarily allows a third party to access and maintain for its own legitimate business purposes. *State v. Johnson*, 340 Or 319, 336, 131 P3d 173 (2006) (holding that the defendant did not have an interest in keeping private historical call records where the service provider independently kept the records for billing purposes); *Sparks*, 267 Or App at 191-92 (concluding that the defendant did not have a privacy interest in subscriber, usage, and payment records stored by his utility provider where the provider used that information for billing); *State v. Delp*, 218 Or App 17, 25-27, 178 P3d 259, *rev den*, 345 Or 317 (2008) (holding that the defendant did not have a privacy interest in internet subscription information held by an internet service provider that independently maintained that information for its own business purposes).

We decline to extend the third-party doctrine to the privacy interest at issue here. As applied in other Oregon cases, the third-party doctrine has encompassed instances where the government obtained historical records that the third parties happened to independently maintain in the course of their regular business practices, such as billing. *Johnson*, 340 Or at 336; *Sparks*, 267 Or App at 191; *Delp*, 218 Or App at 25. On this record, there is nothing to show that AT&T independently maintained defendant's location at the moment requested for an independent purpose. Instead, the evidence shows that AT&T pinged defendant's phone at the government's urging to fulfill the government's request under the SCA. The ability of the government to access independently maintained, historical records under the third-party doctrine is not easily extended to the qualitatively different action of asking a third party to actively produce a record of a person's real-time location. Under those circumstances, where the third party generated real-time location information pursuant to the government's request, the fact that a cell phone's location was facilitated through a third party does not overcome the protection provided by Article I, section 9.[8]

---

[8] We therefore need not reach defendant's argument under the Fourth Amendment, *see* 316 Or App at 502 n 10.

B.  *Exigent Circumstances*

Our conclusion that defendant had a privacy interest does not end our analysis. Under Article I, section 9, "a search conducted without a warrant is deemed unreasonable unless it falls within one of the few specifically established and carefully delineated exceptions to the warrant requirement." *State v. Mazzola*, 356 Or 804, 810, 345 P3d 424 (2015) (internal quotation marks and brackets omitted). One of those carefully delineated exceptions is the exigent circumstances exception. *State v. Snow*, 337 Or 219, 223, 94 P3d 872 (2004).[9] An exigent circumstance is "a situation that requires police to act swiftly to prevent danger to life or serious damage to property, or to forestall a suspect's escape or the destruction of evidence." *Id.* (internal quotation marks omitted). Whether the facts here justify a warrantless search due to exigent circumstances is a question of law. *State v. Ritz*, 291 Or App 660, 662, 422 P3d 397 (2018). In evaluating whether the warrantless search was justified, we are bound by the trial court's findings of historical fact if evidence supports them. *State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991).

Defendant argues that exigent circumstances did not justify a warrantless search in this instance. Defendant focuses on three specific facts. First, he argues that there was no threat of imminent physical harm because police found pieces of at least one shotgun at the scene, which suggested that the suspects' firearms were no longer functioning. Second, defendant argues that any risk that W and defendant would meet to "exact revenge" based on their 8:35 p.m. text exchange had dissipated by the 11:14 p.m. ping request, due to the amount of intervening time. And third, defendant argues that any potential target was protected from imminent physical harm, because L and B were at the hospital and J and W were being interviewed by police.

The state argues that, after reviewing defendant's messages to W and J in which defendant threatened the lives

---

[9] The exigent circumstances exception requires both probable cause and an exigent circumstance. *Snow*, 337 Or at 223. Defendant does not contest that probable cause existed in this case, so we focus our analysis on the sole question of whether an exigent circumstance existed that justified the detectives' failure to obtain a search warrant prior to the ping.

of numerous people associated with W, a threat to at least J's life existed. That threat was heightened by the detectives' knowledge that defendant and an associate had driven across the country to settle a score with W, that the exact condition of their weapons was unknown, that the pair had just fatally shot a family member of W, and that defendant had expressed an interest in continuing to engage with W after the shooting. Thus, the state argues, the trial court did not err in determining that the state's warrantless ping of defendant's phone at 11:14 p.m. was justified by exigent circumstances.

We are persuaded that, in view of all the information police possessed, including the escalating threats culminating in the shooting of W's father, there remained an imminent threat to human life that required the officers to immediately locate defendant. *See Stevens*, 311 Or at 129-32 (evaluating the evidence gathered by officers over the course of their investigation in determining that an exigent risk to human life existed).

Defendant had sent threatening messages to J for months leading up to the shooting. In response to not receiving the correct amount of marijuana, defendant, in turn, threatened the lives of W, J, and their unborn child, threatened to "cocktail bomb" their home and shoot the "first person to run out," and stated that W would be the "death of you all." Defendant demonstrated a willingness to carry those threats to fruition. He had coordinated the slashing of J's tires from out of state, and, as the trial court found, escalated further when he drove "a third of the way across the country" with a commitment and plan to settle W's debts.

On the night of the shooting, defendant had entered W's family's home, without regard as to whether W was present, threatened four people with a gun and fatally shot one of them. When W did return to the residence, defendant instructed Carrera to follow W. Carrera gave chase and returned, stating that he "took care of it." That statement, combined with defendant's post-shooting willingness to meet up with W, conveyed that defendant likely intended to continue settling the debt for which he had travelled across the country. Defendant's shooting of W's father and

defendant's messages threatening both W and J's family generally, showed that defendant's willingness to use violence extended beyond just W and was not limited to a specific victim. Defendant had fled the scene, armed, and in a car.

The detectives' investigation revealed that defendant was committed to carrying out his threats and posed an imminent threat to the lives of J, L, and anyone inside their families' homes. With those considerations in mind, we conclude that, under the circumstances at the time defendant's phone was pinged, the detectives had reasonable grounds to believe that immediately locating defendant was necessary to prevent physical harm to J, W, and their families.[10] The trial court, therefore, did not err in refusing to suppress evidence resulting from the ping of defendant's phone.

## IV.   SENTENCE

In his third assignment of error, defendant argues that the trial court erred in imposing consecutive, mandatory sentences so that defendant will only be eligible for parole after a period of 25 years. Defendant argues that his sentence is disproportionate under Article I, section 16, of the Oregon Constitution, which requires that "all penalties shall be proportioned to the offense." Whether a sentence is disproportionate under Article I, section 16, is a question of law. *Ryan*, 361 Or at 614-15. In conducting that review, we are bound by any findings of historical fact that the trial court may have made, if they are supported by evidence in the record. *Id.*

In considering the proportionality of a sentence, the overarching inquiry is whether the length of the sentence would shock the moral conscience. *Id.* at 612. That standard

_____

[10] By concluding that a ping is a search under Article I, section 9, we do not reach defendant's arguments that the ping also violated his rights under the Fourth Amendment. *See Campbell*, 306 Or at 173 (explaining that where the court found a privacy interest under Article I, section 9, the court "need not address defendant's Fourth Amendment arguments"). In this case, assuming defendant did have a right to privacy in his real-time CSLI under the Fourth Amendment, the exigency exception under the Fourth Amendment would have similarly justified the warrantless ping. *State v. Fessenden*, 355 Or 759, 775-76, 333 P3d 278 (2014).

reflects that the legislature has the primary authority to determine the gravity of an offense and the appropriate length of punishment, and that a court will only conclude that a particular punishment is unconstitutionally disproportionate in the rare instance when the legislature has exceeded that authority. *Id.*

The Oregon Supreme Court has identified the following three factors for determining whether a sentence is constitutionally disproportionate to the offense, as applied to a particular defendant: "(1) a comparison of the severity of the penalty and the gravity of the crime; (2) a comparison of the penalties imposed for other, related crimes; and (3) the criminal history of the defendant." *State v. Rodriguez/Buck*, 347 Or 46, 58, 217 P3d 659 (2009).

Here, defendant raises arguments only as to the first factor in *Rodriguez/Buck*. Under that factor, a court "may consider, among other things, the specific circumstances and facts of the defendant's conduct that come within the statutory definition of the offense," such as the defendant's personal characteristics. *Id.* at 62. An offender's intellectual disability is such a characteristic. *Ryan*, 361 Or at 620-21. In *Ryan*, the Supreme Court held that, where evidence of an offender's intellectual disability is presented, a trial court must consider that intellectual disability, including how the disability affects the offender's level of understanding of the nature and consequences of his conduct and his ability to conform his conduct to the law. *Id.* at 621. A trial court commits reversible error where the record demonstrates that the court only "generally note[s]" the fact of an offender's intellectual disability rather than addressing the "constitutional implications" of a defendant's intellectual disability on the gravity of the sentence. *Id.* at 624. A trial court, therefore, must address on the record a defendant's intellectual disability in comparison to the gravity of the offense. *State v. Fudge*, 297 Or App 750, 757, 443 P3d 1176, *rev den*, 365 Or 819 (2019).

We understand defendant to argue that the trial court failed to adequately consider the first *Rodriguez/Buck* factor in light of *Ryan*. The state argues that the record reflects that the trial court considered defendant's

intellectual disability when concluding that life with the possibility of parole after 300 months was a constitutionally proportionate sentence. We agree that the record sufficiently reflects that the trial court considered evidence of defendant's intellectual disability in comparison to the gravity of the offense.

Defendant's experts at trial testified that defendant is mildly intellectually disabled, with an IQ of around 72. One of defendant's psychologists testified that defendant's disability manifested in poor judgment and reactive impulsivity. The psychologist also testified that defendant has developed academically to the level of someone in the sixth or seventh grade, despite having completed high school and being enrolled in college at the time of the offense.

At sentencing, the record reflects that the trial court considered the evidence presented of defendant's intellectual disability as it evaluated the severity of the punishment to the gravity of the crime. As the trial court was considering the first factor under *Rodriguez/Buck*, the court was unpersuaded by the experts' testimony that defendant was functioning at the level of an 11-year-old, and instead found that defendant "clearly knew right from wrong," had a "moral compass," and yet had made a plan to come to Oregon to "settle a score" by force. Those determinations laid the foundation for the trial court's finding that

> "it does not shock the conscious [*sic*] of anybody in the community that a 22-year-old that shoots and kills someone else during the course of a robbery would get a life sentence with a mandatory minimum of 25 years."

With that record, we determine that the trial court sufficiently explained how it viewed the implications of defendant's disability in regard to the gravity of the offense. The trial court did not err in determining that defendant's sentence of life with the possibility of parole was constitutionally proportionate.

## V.   CONCLUSION

In sum, the pinging of defendant's phone to reveal its real-time location was a search under Article I, section 9, but exigent circumstances permitted the detectives to ask

the cell service provider to reveal that information without first obtaining a warrant. The trial court did not err in denying defendant's motion to suppress. Defendant's sentence is not constitutionally disproportionate. Therefore, we affirm.

Affirmed.